**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

UNITED STATES OF AMERICA

      -against-                         24 CR 77 (NCM)

**ZHENHUA LI**,

                   *Defendant.*
-------------------------------------------------------------x


## ZHENHUA LI'S SENTENCING MEMORANDUM


**ROBERT CALIENDO, ESQ.**
**31 West 34th St., 7th Floor**
**New York, NY 10001**
**Tel. (646) 668-5615**
rc@caliendo-law.com

*Attorney for Zhenhua Li*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................3

PART ONE: OFFENSE CONDUCT AND INVESTIGATION.................................3

Heightened Acceptance Of Responsibility..................................................4

PART TWO: THE SENTENCING GUIDELINES.........................................................5

Defense Calculation...................................................................................5

Government / Probation Calculation ..............................................................6

Tax Loss Was Less Than $550,000 ................................................................6

Corporate Income Tax Due For 2016 To 2018 Was "$134,041.39" ...........................7

FICA / Payroll Tax Due For 2016 To 2018 Was "$173,978.22" ................................8

The Guidelines Are Inapt Regardless Of §§ 2T4.1(G) Or (H)..................................8

PART THREE: NON-JAIL PUNISHMENTS .............................................................14

Probation, Supervised Release, and Other Alternatives .................................14

Restitution .............................................................................................16

PART FOUR: § 3553 RENDERS JAIL INAPPROPRIATE ........................................19

The Court Cannot Send Li To MDC ...........................................................24

Re-Offense Is Highly Improbable ..............................................................26

Li Experienced Enormous Deterrence And Consequences.........................27

CONCLUSION .............................................................................................28

<u>INTRODUCTION</u>

Zhenhua Li respectfully submits this sentencing memorandum addressing the offense conduct, sentencing guidelines, non-jail alternatives, and § 3553 grounds for a non-jail sentence. Sentencing is Sept. 12, 2024. ECF No. 10.[1]

<u>PART ONE: OFFENSE CONDUCT AND INVESTIGATION</u>

On March 14, 2024, Li was arrested and pled guilty to conspiring to impair the Internal Revenue Service ("IRS"). ECF No. 4 (one-count information charging 18 USC § 371 with no minimum imprisonment and five-year maximum).

Li ran a construction company ("Tip Top") employing his ex-wife, her nephew,[2] and numerous laborers who expected cash wages, hired *ad hoc* as jobs dictated. "During the 2016, 2017 and 2018 tax years, [Li] cashed [customer] checks [to] pay his employees and pay for business expenses." *Id.* ¶ 4. Li "failed to report to the IRS a significant portion of this cash income" which illegally reduced Tip Top's income tax liability. *Id.* The same conduct also "underreported cash wages paid to employees" knowing this reduced the "amount of FICA taxes that Tip Top owed." *Id.* at ¶ 5. Li and his family lived modestly with no evidence of luxury or unexplained wealth.[3]

---

[1] "Defendant's sentencing submissions … are due ten (10) business days prior to the date of sentencing." Individual Practice Rules of Judge Natasha C. Merle, Rule (V)(E)(2)(a).

[2] The government declined to prosecute the ex-wife and nephew.

[3] *See also,* Ex. A, Daughter's Letter ("He worked tirelessly and while we had real food on our plates, he ate only dollar cups of ramen. He'd wear the same clothes over and over so he could provide [for] us"). (All support letters are filed as a single PDF – Ex. A – while counsel refers to a particular letter's author when citing it. Within Ex. A, letters generally appear in order of citation.)

<u>Heightened Acceptance Of Responsibility</u>

Li accepted responsibility more quickly and robustly than most, justifying leniency beyond USSG § 3E1.1.[4] On Dec. 7, 2021, the government subpoenaed Tip Top's books and records with immediate compliance. On "January 6th 2022 [an accountant] provided 2 boxes of records labeled as follows … to" the IRS. Ex. B, IRS Receipt for Tip Top Construction Records.

> Box 1:
>> Vendor Invoice (Jan 2017 – June 2018)
>
> Box 2:
>> Income & Expenses Spreadsheet
>> Deposit Summary with Checks Copy
>> Construction Materials Cost Invoice Summary
>> Sub-contractor List
>> Labor Cost Summary with Log Book
>> Vendor Invoice (Jan 2016 – Dec 2016)

*Id.*

The government investigated and on Nov. 15, 2023, Li proffered, truthfully and completely answering every question. There was no *quid pro quo* for that cooperation, such as safety valve[5] or substantial assistance[6] departure. Nor a *Pimentel* letter[7] or plea

---

[4] This is a § 3553 variance argument, not a departure or substantial assistance argument. Counsel places the narrative here for chronology's sake.

[5] 18 USC § 3553(f).

[6] USSG § 5K1.

[7] *U.S. v. Pimentel*, 932 F.2d 1029 (2d Cir. 1991).

offer at that time. Had the case lent itself to more proffers, further investigation, or had

Li known of broader or more organized illegality, he would have formally cooperated.

Instead, Li pled guilty at his very first court appearance, sparing the Court and

government tedious adjournments, formal discovery, and motion practice. *U.S. v.

Moran*, 14 CR 348, 2024 WL 2577970, *2 (EDNY May 24, 2024) (emphasizing

sentencing value of "self-surrender prior to being charged, [which] saved the

Government considerable resources in its investigation and drastically shortened the

investigation's timeline," even where "the parties disagreed on the proper loss and

restitution amounts [and] a *Fatico* hearing was necessary"). Since then, "the defendant

has complied with all Court-ordered conditions of release." PSR ¶ 3. Li hoped only to

atone, and potentially get credit at sentencing.

## PART TWO: THE SENTENCING GUIDELINES

### Defense Calculation[8]

| | |
|---|---|
| Base Offense Level per §§ 2X1.1(a) & 2T4.1(G) (loss over $250,000) | 18 |
| Acceptance of Responsibility per § 3El.1(a) | -3 |
| Zero Point Offender per § 4C1.1 | -2 |

Total Adjusted Offense Level: 13

A total adjusted offense level of 13, in CHC I, yields an advisory guideline range

of 12 to 18 months.

---

[8] The instant plea agreement did *not* bind Li to the government's USSG calculation or restitution figure.

Government / Probation Calculation

| | |
|---|---|
| Base Offense Level per §§ 2X1.1(a) & 2T4.1(H) (loss over $550,000) | 20 |
| Acceptance of Responsibility per § 3El.1(a) | -3 |
| Zero Point Offender per § 4C1.1 | -2 |

Total Adjusted Offense Level: 15

A total adjusted offense level of 15, in CHC I, yields an advisory guideline range of 18 to 24 months.

Tax Loss Was Less Than $550,000

How much tax should Tip Top have paid for 2016, 2017, and 2018? The underlying figures – income and expenses – aren't disputed and stem from the aforementioned books and records. Ex. B, IRS Receipt for Tip Top Construction Records. There is no factual dispute – only legal disagreement about how to calculate tax from those inputs.

USSG § 2T4.1(H) yields a base offense level of 20 for a tax loss more than $550,000, whereas § 2T4.1(G) yields base level 18 for loss more than $250,000. The defense calculates $134,041.39 due in corporate income tax, plus $173,978.22 in FICA / payroll tax, totaling $308,019.61. Ex. C, Defense Tax Calculation at page 1 (chart summarizing defense and government assertions by year and tax type). The government calculates $322,052.00 due in corporate income tax, plus $347,956.46 in payroll / FICA tax, totaling $670,008.46. *Id.* If the defense prevails on either the income tax *or* payroll tax questions, loss is under $550,000 and § 2T4.1(G) applies.

<u>Corporate Income Tax Due For 2016 To 2018 Was "$134,041.39"[9]</u>

For the income tax, *there's one single accounting disagreement* relating to 2017. And IRS only raised a technical, not substantive, objection to the defense analysis. Using the same inputs as the government, both sides calculate essentially the same income tax obligations for 2016[10] and 2018.[11] The 2017 bill differs because the defense accounts for a "[n]et operating loss deduction." 26 USC § 172. In other words, 2018's undisputed losses "carryback" to reduce the 2017 tax obligation. 26 USC § 172(c) ("the term 'net operating loss' means the excess of the deductions … over the gross income"); 26 USC § 172(a)(1) ("[t]here shall be allowed as a deduction for the taxable year an amount equal to … the net operating loss carrybacks to such year"). Counsel proffered Ex. C and its analysis to the government during plea negotiations. IRS responded in sum and substance, that because returns weren't actually filed, IRS would not accept a defense calculation – but no substantive disagreement was raised. However, IRS preference for filed returns cannot force a district court to ignore legitimate analysis in determining USSG tax loss.

---

[9] Ex. C, Defense Tax Calculation at page 1 (where the row "Total Corporate Income Tax Due" meets column "Our Calculated" and supported by "Note 4, 5" at pages 5 to 6).

[10] IRS has "$52,685.00" versus the defense's "$52,589.23." Ex. C, Defense Tax Calculation at page 1 (where the row "Year 2016" meets columns "[IRS] Auditor Calculated" and "Our Calculated" and supported by "Note 4, 5" at pages 5 to 6).

[11] The parties agree no corporate income tax owed in 2018. *Ibid.*

<u>FICA / Payroll Tax Due For 2016 To 2018 Was "$173,978.22"[12]</u>

Here, the government's number is exactly double the defense number. That's because "FICA tax is a 15.3% tax that[ y]ou and your employer split [] fifty-fifty, each paying 7.65%."[13] In other words, Li should be criminally responsible only for the half of that tax his company owed – not what laborers owed. Ex. C, Defense Tax Calculation at pages 2-4 (calculating the "Fica Tax" obligation at "7.65%"). Even if Tip Top was supposed to withhold both halves of the payroll tax, only half of the actual tax burden belongs to Tip Top.

<u>The Guidelines Are Inapt Regardless Of §§ 2T4.1(G) Or (H)</u>

"A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *U.S. v. Genao*, 869 F. 3d 136, 140 (2d. Cir. 2017). *Booker* requires the Court to "consider the Guidelines." 543 U.S. 220, 259 (2005). SCOTUS stubbornly insists that "the Guidelines should be the starting point and the initial benchmark." *Peugh v. U.S.*, 569 U.S. 530, 536 (2013). Real-world judging says otherwise, with broad consensus that tax guidelines are unduly harsh. Scores of courts refuse to cage even repeat offenders with worse conduct or bigger losses:

---

[12] Ex. C, Defense Tax Calculation at page 1 (where the row "Total Payroll Tax Due" meets column "Our Calculated" and supported by "Note 1, 2, 3" at pages 2 to 4).

[13] E. Napoletano, *What is FICA Tax and How Does it Work*, Wall Street Journal (Jan. 22, 2023 ) (available at: https://www.wsj.com/buyside/personal-finance/what-is-fica-tax-01674395539) (last visited June 17, 2024).

- *U.S. v. Daniel Walchli*, 20 CR 497 (SDNY) (GHW), ECF No. 109 at 4, 8, 19-22 ("Wälchli was a member of the Executive Board of … a Swiss holding company that owned … a Swiss private bank in Zurich [engaged in] a complex criminal scheme … to aid certain U.S. clients in concealing from U.S. tax authorities the true ownership of certain undisclosed U.S.-related accounts. Wälchli was the highest-level [] Holding [company] executive to be involved in planning and design aspect of the conspiracy. Wälchli was the driving force behind [another aspect of the conspiracy and his] approval was key. Wälchli coordinated the efforts of his co-conspirators [and] was in charge of resolving fee disputes among the other conspirators."). He pled "to one count of conspiracy to defraud the United States and the IRS" with a "range [of] 18-24 months in prison" having "helped hide more than $60 million from the IRS, and caused a tax loss of at least $531,524." *Id.*; ECF No. 110 (4/2/24 judgment imposing "time served" with "no term of supervised release" plus a "fine of $50,000.00").

- *U.S. v. Alice Bixuan Zhang*, 21 CR 309 (EDNY) (AMD), ECF No. 51 at 1-3, 18 (tax loss "over $780,000" and USSG range of "21-27 months' imprisonment," where offender pled guilty *four days* before jury selection and later "refuse[d] to accept responsibility" – she and her sister "operated multiple successful acupuncture and wellness businesses" and "engaged in a years-long scheme to divert corporate income by using a web of [fake] shell companies … to which

they wrote checks from their revenue-producing businesses [and] cashed the checks[, while hiring] multiple accountants, hiding parts of their scheme from each so that none had a full picture[, so] the checks would be deducted from taxable income as expenses from the revenue-producing businesses, but never declared on the shell corporation tax returns[, all while t]hey spent the cash on renovations, an under-the-table cash payroll, and split the rest evenly among themselves"); ECF No. 54 (12/15/23 judgment imposing "time served, one year supervised release, … a $20,000.00 fine, and restitution in the amount of $257,444.00").

- *U.S. v. Irwin Jacobs*, 20 CR 457 (EDNY) (PKC), ECF No. 21 at 2 ("a total tax loss of approximately $1,358,275"); ECF No. 23 (11/22/23 judgment imposing sentence of "three years … probation" plus "restitution").

- *U.S. v. Chinn*, 19 CR 915 (SDNY) (VM), ECF No. 24 at 2 (plea "to one count of tax evasion for the calendar years 2001 through 2018" for "a long-running and sophisticated scheme to evade [] taxes through the use of multiple offshore accounts, resulting in a combined [tax] loss of at least $789,219" by "an experienced businessman with two prior federal convictions, including for tax crimes"); ECF No. 37 (9/2/22 judgment imposing "five years … probation" which includes "an 18-month term of House Arrest, subject to [numerous] exception[s]" plus "$789,219.00" in restitution).

- *U.S. v. Taffaro*, 919 F.3d 947 (5th Cir. 2019) (no "abus[e of] discretion" where offender "convicted by a jury of several counts of tax evasion and filing false income tax returns," who faced "a guidelines imprisonment range of 27 to 33 months," got "60 months' probation and [] a fine").

- *U.S. v. Rockwell Gajwani*, 16 CR 660 (SDNY) (LAP), ECF No. 46 at 2-3 (USSG "range of 51 to 63 months' imprisonment" where "defendant abused his position as the Chief Executive Officer of a Manhattan-based real estate investment company … to embezzle more than $1 million from the[m, plus, a]side from stealing [the] funds he committed tax fraud by reporting to the Internal Revenue Service ("IRS") neither the full amount of the funds that he was entitled to as compensation and received, nor the more than $1 million that he" stole); ECF No. 49 (11/30/17 judgment imposing "5 years [probation] with a period of six months of home confinement"); ECF No. 47 (order to "pay restitution … of $1,959,083.54 to [victim, plus] restitution … of $187,628 to the IRS in connection with Count Three[, plus] restitution … of $109,520 to the IRS in connection with Count Four").

- *U.S. v. H. Ty Warner*, 13 CR 731 (N.D. Ill.), ECF No. 26 at 2, 14 (billionaire creator of Beanie Babies pled to "tax evasion" spanning over a decade with a "total amount of tax loss [of] $5,594,877"); ECF No. 30 (1/14/14 judgment imposing "two years … probation" plus "monetary penalties").

- *U.S. v. Park*, 12 CR 344 (EDNY) (FB), ECF No. 9 at 2-4 (plea to "one count" of "filing a materially false income tax return for a corporation" for "tax loss [of] $133,601" for offender with a prior "jury" conviction "of two counts of mail fraud for a scheme where [he] deceived investment clients [with loss] of more than $6 million to investors, with $2 million directly attributable to [him, for which he got] one year and one day" in prison on that prior conviction); ECF No. 13 (10/24/13 judgment imposing "three years … probation," including "six months of home confinement *without* electronic monitoring," and *no* "fine" or "restitution") (emphasis supplied).

- *U.S. v. Wachsman*, 04 CR 902 (EDNY) (DRH) (2/18/05 judgment imposing "five years … probation" plus a "$30,000.00" fine and "$119,293.72" restitution on plea to one count of tax evasion).

Sentencing Commission statistics further illustrate the point. The government calculates an 18 to 24 month range. That's not a useful starting point given almost *every* CHC I tax offender gets less than 2 years anyway, *regardless* of their guidelines.[14] It's an equally unhelpful end point where the "average … sentence length" is only "8" months and the "median … length" is just "4" months. *Id.* That's across "490 cases reported to

---

[14]   https://ida.ussc.gov/analytics/saw.dll?Dashboard (visited June 17, 2024), under "Sentencing Outcomes" then "Sentence Length," filtering for "Fiscal Year: 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023; Circuit: 2nd Circuit; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Tax; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All") (reporting that "89.8%" of offenders get "[l]ess than 2 years" imprisonment).

the Commission" – a very healthy sample size. *Id.* But jail should not be presumptive, *at all*. Over one-third get "probation only" or "fine only."[15] Another combined 15.3% get non-jail "alternatives."[16] Thus, non-jail sentences are statistically very common. Indeed, the *guidelines sentence* is the radical outlier. Across the same "490 cases … within range" sentences *never* capture more than a sliver of outcomes.[17]

Frequent non-jail outcomes and rare guideline sentences make sense given "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 USC § 994(j).[18] Whether it's the two uncharged co-conspirators in this case, the battery of non-jail caselaw *supra*, or the

---

[15] https://ida.ussc.gov/analytics/saw.dll?Dashboard (visited June 17, 2024), under "Sentencing Outcomes" then "Sentence Type," filtering for "Fiscal Year: 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023; Circuit: 2nd Circuit; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Tax; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All") (reporting "33.1% for "probation" and "1%" for "fine").

[16] *Ibid.* "Alternatives include all cases in which individuals received conditions of confinement as described in USSG §5C1.1." *Id.*; USSG § 5C1.1 (offering "community confinement or home detention").

[17] https://ida.ussc.gov/analytics/saw.dll?Dashboard (visited June 17, 2024), under "Guideline Application" then "Sentences Relative to Guideline Range," filtering for "Fiscal Year: 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023; Circuit: 2nd Circuit; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Tax; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All") (reporting in table form, as "within range" for each noted year, "17.1%, 9.0%, 14.5%, 6.3%, 17.2%, 10.7%, 17.1%, 11.1%, [and] 3.3%").

[18] Counsel does not minimize the instant offense. But the statute's context suggests a "serious[ness]" comparable to a "crime of violence," which this is not. *Id.*

hundreds of USSC statistical defendants, caging Li creates "unwarranted sentence disparities." 18 USC § 3553(a)(6).

PART THREE: NON-JAIL PUNISHMENTS

Probation, Supervised Release, and Other Alternatives[19]

Probation is allowed. *Compare* 18 USC § 3561(a) *to* § 3559(a)(4) (defining a D Felony). "The authorized term[] of probation" is "not less than one nor more than five years." 18 USC § 3561(c)(1). Probation is a non-guidelines sentence because Li's not in "Zone A" or "B of the Sentencing Table." USSG § 5B1.1. "The court, in determining whether to impose a term of probation, and … the length of the term and the conditions …, shall consider the factors set forth in section 3553(a)." 18 USC § 3562(a). "[P]robation" is not "an act of leniency" – it's serious punishment with "substantial restriction of freedom." *Gall v. U.S.,* 552 US 38, 48 (2007). A "conviction itself already visits substantial punishment on the defendant." *U.S. v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).

"[T]he authorized term[] of supervised release [is,] … for a Class D felony, … not more than three years." 18 USC § 3583(b)(2). The supervised release guideline range is between "one [and] three years." USSG § 5D1.2(a)(2).

---

[19] "Sentencing submissions should affirmatively address the applicability of … incarceration, probation, and supervised release." Individual Practice Rules of Judge Natasha C. Merle, Rule (V)(E)(2)(d).

The Court may also consider "community confinement (residence in a community treatment center, halfway house, or similar residential facility)" or "home detention." USSG § 5C1.1(e). "Community confinement may be imposed as a condition of probation or supervised release." USSG § 5F1.1. "Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment." USSG § 5F1.2. Home detention is a non-guidelines sentence but "[o]ne day of home detention" may otherwise "[s]ubstitute … for one day of imprisonment." USSG § 5C1.1(e)(3). "Community service may be ordered as a condition of probation or supervised release." USSG § 5F1.3.

***

Regardless of the type of supervision ordered, the Court must not gift probation blanket discretion to block "self-employment, including any independent, entrepreneurial, or freelance employment or business activity." ECF No. 12 (Li's PSR objection to PSR ¶ 74). The Circuit recently attacked unjustified restrictions. *U.S. v. Gorychka*, No. 23-6457-CR, 2024 WL 3964287, *1-3 (2d Cir. Aug. 28, 2024) (even under "plain error" standard in a "child pornography" case, remanding because an "occupational restriction" requires a "reasonably direct relationship between the [] occupation and [] offense conduct, and that the restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted"); *U.S. v. Kareem Everson*, 21 CR 206 (EDNY), ECF No. 184

at 1-4 (even with an "appellate waiver" and "*Anders*" brief, on August 6, 2024, the Second Circuit" *sua sponte* "issued an order remanding" given an unjustified "broad search condition").

Restitution[20]

Li's plea agreement contemplates restitution per "18 USC §§ 3663 and 3664" but allows the parties to argue the amount. *See*, Plea Agreement ¶ (1)(e). "Any dispute as to the proper amount or type of restitution shall be resolved by … preponderance of the evidence." 18 USC § 3664(e). The government bears that "burden." *Id.*; *U.S. v. Rutigliano*, 887 F.3d 98, 109 (2d Cir. 2018).

Discussed *supra*,[21] the defense calculates $134,041.39 due in corporate income tax, plus $173,978.22 in FICA / payroll tax, plus, totaling $308,019.61. Ex. C, Defense Tax Calculation. The government calculates $322,052.00 due in corporate income tax, plus $347,956.46 due in payroll / FICA tax, totaling $670,008.46. *Id.* Counsel relies on the arguments discussed *supra* for these amounts.

---

[20] "Sentencing submissions should affirmatively address the applicability of restitution and forfeiture." Individual Practice Rules of Judge Natasha C. Merle, Rule (V)(E)(2)(d). The government does not seek forfeiture.

[21] Potential rejection of defense USSG loss argument does not compel the same restitution result. Indeed, USSG loss is often broader than restitution liability. For example, USSG "intended" loss and "relevant conduct" standards are broader than "restitution['s]" actual loss and "offense of conviction" standards. *U.S. v. Vilar*, 729 F.3d 62, 95-97 (2d Cir. 2013); *U.S. v. Germosen,* 139 F.3d 120, 130-131 (2d Cir. 1998) (same).

Recall that the government's FICA / payroll number is exactly double the defense number because "FICA tax is a 15.3% tax that[ y]ou and your employer split [] fifty-fifty, each paying 7.65%."[22]; Ex. C, Defense Tax Calculation at 2-4 (calculating the "Fica Tax" obligation at only "7.65%"). What purpose is served by making Li pay his laborers' tax obligations? No marginal specific or general deterrence exists. Ironically, the extra $173,978.22 helps crush Li financially, potentially forever, while having essentially *zero* impact on U.S. Treasury coffers.

The Court has considerable "discretion" in any "decision whether to apportion restitution among" responsible parties. *U.S. v. Nucci*, 364 F.3d 419, 422 (2d Cir. 2004) ("Nucci was sentenced to pay the entire loss even though co-defendants were required to pay portions of the same loss"); *U.S. v. Campbell*, 21 CR 478 (FB), 2023 WL 2446256, *2 (EDNY Mar. 10, 2023) ("failed to demonstrate by a preponderance of the evidence that the victim bank lost $3,500,000 in connection with the scheme Campbell and Wint participated in, or that it would be reasonable to hold them jointly and severally liable for this sum [so instead the] Court imposes $300,000 in restitution on Campbell—the amount he accepted in connection with his fraudulent activity and additional funds to account for the fact that he helped put in motion a scheme causing a much larger loss[,

---

[22] E. Napoletano, *What is FICA Tax and How Does it Work*, Wall Street Journal (Jan. 22, 2023 ) (available at: https://www.wsj.com/buyside/personal-finance/what-is-fica-tax-01674395539) (last visited June 17, 2024).

…] and because Wint served only as a low-level clerk in in the overall fraud scheme, the Court imposes $100,000 in restitution on Wint").[23]

Directly on point is *U.S. v. Park*, where the defendant "diverted a portion of the cash receipts of [his dry cleaner business so] the gross receipts … were under reported on the tax returns filed by the corporation." 12 CR 344 (EDNY) (FB), ECF No. 9 at 2 (gov. sent. memo). "Park used the diverted cash receipts to pay an 'off the books' payroll to the employees, among other things." *Id.* "[B]ecause of the 'off the books' cash payroll, the quarterly payroll tax returns … were … false" in addition to the income tax returns. *Id. Park's* plea agreement stipulated that his "tax loss … was $133,601, which included the tax on the unreported gross receipts ($67,601) and the unreported payroll taxes ($66,000)." *Id.* Yet the *government* "agreed that the defendant would pay restitution to the IRS [*only*] in the amount of $67,601." *Id.* (emphasis supplied). Thus, *Park* – a repeat offender with a trial conviction for a "$6 million … mail fraud" – owed restitution just for the unpaid corporate income tax, not *any* of the unpaid payroll tax. *Id.* Here, Li is willing to pay restitution for *his* portion of the unpaid payroll tax, just not what's owed by others.

In fixing repayment terms, Li respectfully asks the Court to consider his "economic circumstances." 18 USC § 3664(a); *U.S. v. Corbett*, 357 F. 3d 194, 196 (2d

---

[23] *C.f.,* 18 USC § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant").

Cir. 2004) ("the restitution schedule [should make] allowance [] for reasonable living expenses"). Of course, "the court shall … specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of[, ]the financial resources and other assets of the defendant [and] projected earnings and other income of the defendant." 18 USC 3664(f)(2)(A) & (B). "A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." 18 USC 3664(f)(3)(B).

"A sentencing judge may not authorize a probation officer to dictate the amount of restitution or to establish a schedule for repayment of a restitution order." *U.S. v. Porter*, 90 F. 3d 64, 71 (2d Cir. 1996). And an "ambiguous [restitution schedule] is plain error." *U.S. v. Nucci*, 364 F. 3d 419, 422 (2d Cir. 2004).

## PART FOUR: § 3553 RENDERS JAIL INAPPROPRIATE

Hard work, charity, and hardship have largely defined Li's life. Li was "raised in below average economic conditions in Fujian, China." PSR ¶ 35. His "family struggled financially [and their] home was comprised of one large room, with no distinct bedrooms, and was without running water, electricity, and heat." *Id.* "While the defendant had access to food, it was limited." *Id.*

Li went to college in China's Fuzhou region. "During the 1989 student protests … Li [and another] organized a student march against government tyranny and was subsequently punished." Ex. A, Li Zhang Letter. Li "was assigned to teach in a remote region of China, as punishment for speaking against the government." *Id.* The rural Changle District was only about an hour away from the city but transportation and communication were unlike today. It was like living worlds away and banishment there meant no promotions or career advancement. "Zhenhua Li was subjected to a lot of unfair treatment [but he] did not give up." *Id.* "He loved and cared for his students, cared for his colleagues, was respected by his friends." *Id.*

That oppression couldn't compare to what followed. "In 1998, his wife was ordered to abort their child because she didn't have government documentation." *Id.* The government routinely checked for unauthorized pregnancies. They found out and forced her to abort *the same day*. Undeterred, she became pregnant again. "Given no other choice, and for the safety of his family, Zhenhua was forced to leave China and came to the U.S." *Id.* Li's wife hid at her parents' house while Li fled. It was too risky, legally and medically, for her to travel with him. In 1999 Li spent about a month routing through different countries including Kazakhstan, Russia, Netherlands, and ultimately a dangerous Mexico border crossing.[24] Their son was born in China in Oct. 1999. Li's wife and child came about a year later.

---

[24] Li and his family later sought asylum and naturalized.

They steadily built a life here, but hardship endured. Li has a 21-year-old daughter with severe mental health issues. Ex. A, Daughter's Letter; PSR ¶ 37. Around the transition from middle-school to high-school, she began to exhibit signs of depression, "suicidal ideation," and self-harm. *Id.* She'd isolate and push everyone away. She'd "cut" herself. *Id.* The school psychiatrist couldn't help. Nothing did, and she dropped out. It's difficult to overstate how frightening her "downward spiral" was. *Id.*

Li's unwavering support rescued her. "He had found out I was actively hurting Myself [and] I had cuts all over my wrists." *Id.* "He knocked on my door and stood there, gently asking to see my arm and when he saw it, he just held me." *Id.* He sobbed and begged me not to do it anymore, that I wasn't alone and he would do whatever it takes to help me." *Id.*

"He was the one who influenced me to get my diploma, to seek professional help knowing I wouldn't be judged." *Id.* She received "psychotherapy and medication management." Ex. A, Dr. Chen Letter. "Right now, I work 4 days a week and attend college." Ex. A, Daughter's Letter. [25] In her words, "I need him in my life." *Id.* "He has been the one person who has been with me throughout everything and without him, I'm not sure what to do." *Id.*

---

[25] *See also,* Ex. A, Students' Letter ("Several years ago, during a gathering, he told us about his daughter's psychological issue. He showed his deep concern about his daughter, but he expressed that he would never give up supporting and encouraging his daughter. In May last year when we had dinner together, he told us that his daughter had been back to school and was doing well.)"

Li's 25-years-old son has similar troubles. PSR ¶ 37. In early adulthood mental health issues surfaced, such as hitting and hurting himself. He struggled to hide anxiety, depression, and emotional instability from his parents. But again, Li knew his child desperately needed help. Li's son's psychiatrist confirms "[d]epression and [a]nxiety" with "treatment since July of 2022." Ex. A, Hope Okoroh Letter. "He has been consistent with his visit and medication management." *Id.* Mirroring his daughter's situation, they observe that Li's arrest and sentencing are "causing" his son "extreme anxiety" with concern over "deterioration as far as his mental health, and possibly loss of the emotional and mental stability that he worked so hard to achieve." *Id.*

Li's brother also suffers from pancreatic cancer and is not expected to live through the fall. Ex. D, Brother's Medical Letter and Photograph; PSR ¶ 34 ("age 72, resides in Fujian, China, suffers from pancreatic cancer").

Li treats others as if they were family too. One former "junior high school physics" student recalls that "when I just arrived in the United States, Mr. Li Zhenhua helped me find a house and help me plan my life in the United States." Ex. A, Qiu Feng Letter. "With the help of Mr. Li Zhenhua, I have stabilized down in the United States and achieved great success." *Id.* Even teaching in China, Li showed extra "car[e]" to academically and financially "poor" students, making sure they understood the "homework" and were fed "dinner." *Id.* A different group of "middle school physics"

students corroborate the same, describing lifelong impacts. Ex. A, Students' Letter.[26]

Recall the circumstances under which the government sent Li to teach these kids – many would have been consumed by bitterness not kindness.

Indeed, Li cares for *strangers* as if they were friends or family.[27] Most remarkably, Wenpu Wang was a stranger in China with a debilitating foot deformity. Li felt compelled to spend tens of thousands of dollars of his own money on medical procedures allowing him to walk and have a normal life. Wang's own words are more compelling than counsel's. Ex. A, Wenpu Wang Letter with Photographs; Ex. A, Zhang Qing Letter with Photographs.

---

[26] Ex. A, Students' Letter ("There were some students who did not behave in the school and often cut classes. He cared for these students very much and did not want to leave them behind. After school hours, he visited these students' homes and talked to their parents, trying to get to know more about these students to better help them in school. Some of these students were touched and became determined to change into good students. Soon after that, Mr. Li gathered these students together to tutor them for free during after-school hours and weekends, and he sometimes invited them to lunches.)"

[27] Ex. A, James Wang Letter ("I had also heard a lot of stories from [] students, friends and relatives about how Mr. Li had helped them and their families for their daily life. Mr. Li had spent his own money to help the people who were under finical difficulties or had health related issues"); Ex. A, Daughter's Letter ("My father was always that kind of person for everybody. He wanted to be there for them. Often, we'd have relatives that would come to the United States, lost on what to do. My father would greet them with open arms, providing everything they needed whether it was a shelter in our small home or food"); Ex. A, Son's Letter ("dedicated his life to supporting not only our immediate family but also extended relatives and fellow immigrants from our hometown. His home has always been an open door to those in need, providing shelter and support to cousins, aunts, and even friends of friends, all without asking for anything in return. Growing up as a child there'll be 7-10 people living in our two bedroom home, I never fully understood at the time why my father let it happen until he told me 'If you go on with life only doing generous deeds expecting things in return, you'll never be satisfied'"); Ex. A, Students' Letter ("Mr. Li is so nice that people constantly ask him for helps and he is always willing to help. He says it is more blessed to give than to receive"); Ex. A, Cindy Lam Letter ("He helps others. He helps other people get jobs and contribute to his local community through public service projects").

Li remains the same humble, hardworking, charitable person – whether dirt poor in China, as an immigrant laborer,[28] trying to run a small business in the U.S.,[29] or awaiting sentence in federal court.[30] His current employer is quick to praise his "hardworking attitude." Ex. A, James Wang Letter (corroborating numerous other positive qualities); PSR ¶ 46 ("[s]ince January 2023, the defendant has been employed … earn[ing] between $200 and $400 daily [and] Pretrial [] verified this employment").

## The Court Cannot Send Li To MDC

As a practical matter Li will serve locally, any sentence less than a year. Throw a dart at a pacer docket and you might hit an opinion thrashing MDC. *U.S. v. Colucci*, __ F.Supp.3d __, 2024 WL 3643857 (EDNY, Aug. 5, 2024) (detailing "dangerous, barbaric conditions" at MDC "that have existed for some time" and "loom[] large in nearly every [EDNY] bail and sentencing determination").[31] MDC "sentencing arguments … have

---

[28] Ex. A, Li Zhang Letter ("He started at the bottom. He worked at a construction site and did the most bitter exhausting work, and eventually started his own company")

[29] Ex. A, Son's Letter ("Despite the demanding nature of his work, often requiring 60-hour weeks, my father constantly made time to contribute to my sister's and my education").

[30] PSR ¶ 38 (he now "rents one room of an apartment on the first floor of a two-story residence[, keeping it] tidy and clean [and paying] $500 in monthly rent").

[31] MDC aside, *any* harsh prison circumstance can merit leniency. For example, departure can ground in "status as a deportable alien that [leads to an] unwarranted increase in the severity of [] sentence" because contract-facilities are "not eligible for any early release, [] not [] able to serve [their] sentence in a minimum security prison, and [] may not qualify for reduced credits for participation in a residential drug or alcohol abuse program." *U.S. v. Pacheco-Soto*, 386 F. Supp. 2d 1198, 1205 (DNM 2005); *U.S. v. Wedd*, 15 CR 616, ECF No. 809, p.4 (SDNY April 9, 2021) ("Judge Forrest initially contemplated sentencing Wedd to 168 months, [but] she considered that [because he was a non-citizen] he would be serving his time in a facility where he would not get time off for good behavior and where he would not have the benefit of certain programs," ultimately giving him to 120 months).

become so commonplace that—quite understandably—counsel routinely raise the issue in a shorthand fashion, as lawyers and judges have grown weary of extended articulation." 2024 WL 3643857 at * 6.

Still, the violence, spoiled food, and vermin bear mention. Incessant lockdowns[32] and other problems gut medical care, opportunities for programming, work detail, commissary, and contact with the outside world. The "lockdowns … are 'basically like solitary confinement' [partly because i]nmates have limited programming, next to no family visits and severe limitations on meetings with lawyers."[33] *Id.* And the "devastating effects" of "solitary confinement" are "well documented." *U.S. v. Bout*, 860 F. Supp.2d 303, 308 (SDNY 2012) (also holding that that continued solitary confinement violated Eighth Amendment rights).[34]

---

As another example, former police officers' "susceptibility to prison abuse" is a departure basis "well within the sound discretion of the District Court." *Koon v. U.S.*, 518 U.S. 81, 106-112 (1996); *U.S. v. Volpe*, 78 F. Supp.2d 76, 87-89 (EDNY 1999) (government acknowledged authority to depart downward for police officer "vulnerable to abuse in prison" resulting in a "two-level downward departure under § 5K2.0"); *U.S. v. Bruder*, 103 F.Supp.2d 155, 183 (EDNY 2000) (two-level departure for *Volpe's* co-defendant).

[32] *Id.* at *3 (Aug. 5 opinion noting "continued reports of inordinate periods of lockdown").

[33] Stephen Rex Brown, *NYC federal jail is so bad inmates get 'time and a half': Judge*, New York Daily News (May 24, 2021), https://www.nydailynews.com/new-york/ny-mcc-mdc-hard-time-20210524-cwatz2asojglhm4cvjldbdx33e-story.html (last visited 10/18/21) (accounting for local prison conditions being "harsher than [] usual [and thus] more punitive"), referring to *U.S. v. Daniel Gonzalez*, 18 CR 669 (SDNY) (JPO) (docket notation: "[s]entencing held on 4/2/2021 for Daniel Gonzalez [who is] sentenced to time served").

[34] Additionally, "[s]olitary confinement harms prisoners who were not mentally ill on admission to prison and worsens the mental health of those who were." Peter Scharff Smith, *The Effects Of Solitary Confinement On Prison Inmates: A Brief History And Review Of The Literature*, 34 Crime & Just. 441, 504 (2006); Alexa T. Steinbuch, *The Movement Away From Solitary Confinement In The United States*, 40 New

<u>Re-Offense Is Highly Improbable</u>

Older, "non-violent" offenders, involved in financial illegality, with "education" and no prior "criminal history" are *the absolute least likely* to reoffend.[35] Taking just one variable, Li is 55 years old and "[a]ge is one of the most robust correlates of criminal behavior."[36] "[R]ecidivism drops substantially with age." *Simon v. U.S.*, 361 F.Supp.2d 35, 48 (EDNY 2005) (resentencing "43 year[]-old" defendant below guidelines), *citing U.S. v. Nellum*, 2005 WL 300073 at *3 (ND Ind. 2005); *U.S. v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017) (same); *U.S. v. Hodges*, 07 CR 706, 2009 U.S. Dist. LEXIS 10683, at *26 (EDNY 2009); *U.S. v. Comorna-Rodriguez*, 2005 WL 840464 at * 4 (SDNY 2005) ("declin[ing] to impose Guidelines sentence[] on defendant[] who [was] over the age of

---

Eng. J. on Crim. & Civ. Confinement 499, 508 (2014) ("medical and psychological consequences of solitary confinement are vast, leaving inmates with a variety of negative psychological reactions including: severe and chronic depression, anxiety, problems with impulse control, self-mutilation, decreased brain function, hallucinations, and revenge fantasies"); Michael B. Mushlin, *Unlocking The Courthouse Door: Removing The Barrier Of The PLRA's Physical Injury Requirement To Permit Meaningful Judicial Oversight Of Abuses In Supermax Prisons And Isolation Units*, Federal Sentencing Reporter Volume 24, Number 4, 2012 WL 3288690 ("isolation can have ruinous effects on individuals").

[35] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/rg_recidivism-series.pdf (visited 8/20/24); U.S.S.C., *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (March 2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12 (visited 6/28/24) ("Offenders convicted of an economic crime had the lowest rearrest rate").

[36] Sweeten, G., Piquero, A. R., & Steinberg, L., *Age and the Explanation of Crime, revisited*, Journal of Youth and Adolescence, 42(6) (2013); *Age Specific Arrest Rates ... for Selected Offenses 1993 – 2001*, Federal Bureau of Investigation (Nov. 2003) (visited 6/17/24 and available at http://www.fbi.gov/about-us/cjis/ucr/additional-ucr-publications/age_race_arrest93-01.pdf); David Farrington, *Age and Crime*, Crime and Justice, Volume 7, 1987.

forty on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants").

There is no need "to protect the public from" Li. 18 U.S.C. § 3553(a)(2)(c). Nothing suggests that he will break the law again. 18 U.S.C. § 3553(a)(2)(b).

<u>Li Experienced Enormous Deterrence And Consequences</u>

The Court must consider all "deterrence." 18 USC § 3553(a)(2)(b). "After 2019 [Li] was under the investigation of IRS who had visited almost all of his clients and friends [which] had very negatives impacts for his business." Ex. A, James Wang Letter. "He lost all the trust from clients and associates and no one was willing to work with Mr. Li afterward." *Id.* It's easy to skate past how devastating such collateral consequences are because they don't unfold in court.

"When he is talking about the case, Mr. Li had expressed remorse and is willing to take full responsibility for his actions." *Id.* "He had never blame other people for what had happened to him and caused him to lost all of his business." *Id.* Accepting responsibility and showing a commitment to making amends is an important step towards personal growth and redemption." *Id.*

<u>CONCLUSION</u>

Probation is "sufficient, but not greater than necessary, to comply with" § 3553.

Dated:      Aug. 31, 2024
              New York, NY

                            Respectfully submitted,

                            */S/ Robert Caliendo*
                            _____
                            Robert Caliendo, Esq.
                            Tel. (646) 668-5615
                            rc@caliendo-law.com